UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE RESTASIS (CYCLOSPORINE OPHTHALMIC EMULSION) ANTITRUST LITIGATION | 18-MD-2819 (NG) (LB) |
| THIS DOCUMENT APPLIES TO:<br><br>ALL END-PAYOR PLAINTIFF CLASS CASES | OPINION AND ORDER |

**GERSHON, United States District Judge:**

In this class action, end-payor plaintiffs ("EPPs") have moved under Federal Rule of Civil Procedure 23(c)(2)(B) for an order approving the proposed form and manner of notice of the certification of the end-payor class and appointing A.B. Data, Ltd.'s Class Action Administration Company ("A.B. Data") as the notice administrator. This opinion addresses plaintiffs' proposal regarding the manner of notice and their request to appoint A.B. Data as notice administrator. I will address EPPs' proposed notice forms separately.

Although defendant Allergan, Inc. states that it takes no position on whether EPPs' proposal satisfies the requirements of Rule 23, it offers numerous critiques and, in effect, advocates against the proposal. For the reasons stated below, plaintiffs' proposal regarding the manner of notice and their request to appoint A.B. Data as notice administrator are granted.

**I.    Background**

EPPs allege that Allergan, a pharmaceutical company, took several unlawful actions to delay the market entry of generic versions of its product Restasis. On May 5, 2020, I certified under Rule 23(b)(3) the following class of end-payor plaintiffs:

> All persons or entities who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Restasis, other than for resale, who made their purchases in Arizona, Arkansas, California, Colorado, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine*, Massachusetts*, Michigan, Minnesota, Mississippi, Missouri*, Montana*,

>Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont*, West Virginia, and Wisconsin from May 1, 2015, through the present (in the case of Arkansas only, July 31, 2017), for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries.

The class includes individual consumers of Restasis and third-party payors ("TPPs"), which are entities that pay or provide reimbursement for some or all of the cost of Restasis for individuals they insure. In the states marked with an asterisk, class members are only consumers, not TPPs.

On June 5, 2020, EPPs filed an initial motion seeking approval of the proposed form and manner of notice of the certification of the end-payor class and appointing A.B. Data as the notice administrator. On November 6, 2020, after plaintiffs' motion was fully briefed, I held a lengthy hearing at which I pressed plaintiffs on the adequacy of their plan, focusing on the proposed notice to consumer class members. I also directed EPPs to make several changes to their proposed long- and short-form notices. At the hearing's conclusion, I granted EPPs' request to supplement the original motion with additional briefing. Supplemental briefing was complete on February 4, 2021.

**II.     Plaintiffs' Proposed Manner of Notice**

EPPs request permission to use different methods to provide notice to TPPs and to consumer class members. Plaintiffs' plans are described below. Each relies on A.B. Data's creation and maintenance of a dedicated informational case website that contains the long-form notice and other information about the case, a case Facebook page, and a case-specific toll-free telephone number through which class members can inquire about the case and their options.

**A.     TPP Class Members**

A.B. Data maintains a proprietary database (the "TPP Database") with the names and addresses of approximately 42,000 entities, which include both TPPs and entities that provide

services to TPPs, such as pharmacy benefit managers ("PBMs"), third-party administrators, and law firms. The database was compiled using publicly available sources and information gathered from prior pharmaceutical litigations with which A.B. Data was involved. The database is updated regularly, most recently in October 2020.

Under EPPs' proposal, A.B. Data will use the TPP Database to mail directly a postcard notice to TPPs. The postcard, which will contain information summarizing EPPs' allegations, the contours of the class, and class members' right to exclude themselves, will direct TPPs to visit the class website or call the toll-free number for more information. In addition, A.B. Data will send an email with a link to the long-form notice on the case website to TPPs whose email addresses it has access to. TPPs will also be notified of the class through a 30-day digital media campaign on the website ThinkAdvisor.com/life-health, which is affiliated with the former publication *National Underwriter Life & Health* and is believed to be frequented by insurance agents, brokers, and TPP administrators.

In response to concerns expressed by defendant about the accuracy of the TPP Database, EPPs revised their plan to check the TPP Database against IQVIA Xponent data on Restasis purchases provided by plaintiffs' counsel. The Xponent data was used by one of plaintiffs' experts on class certification, Richard G. Frank, to show which TPPs paid for Restasis.

### B. Consumer Class Members

EPPs propose to notify consumer class members using internet advertising and social media websites. Specifically, A.B. Data will administer a 30-day campaign to distribute at least 204 million internet impressions[1] over leading networks, including Google's advertising network and social media websites such as Facebook, Instagram, and YouTube. The ads will be geo-

---

[1] Each time content is displayed on the internet, it creates an impression.

targeted to appear primarily in the states identified in the class definition, and they will direct class members to the website containing the long-form and short-form notices and additional information about this class action, including the toll-free telephone number. Ads will be positioned prominently on websites and social media sites to ensure that they can be seen easily when viewers first open website pages. And, during the media campaign, A.B. Data's digital media experts will monitor its progress and make adjustments to optimize the number of impressions delivered across each platform to achieve maximum engagement and efficiency.

A.B. Data also will disseminate a news release via *PR Newswire*'s US1 Newline distribution list, which includes about 10,000 newsrooms, to announce the pendency of this case as a class action. Finally, news about the case will be broadcast to the news media through *PR Newsire*'s and A.B. Data's Twitter accounts.

In response to my questions at the hearing, EPPs enhanced their notice plan to include publication of the short-form notice on one occasion in each of two magazines with large national audiences—*AARP: The Bulletin* and *People Magazine*. They also agreed to make Spanish versions of the notices available on the case website and to ensure that Spanish-speaking representatives will be available at the toll-free number. Plaintiffs also provided a much more robust explanation supporting their choice to notify class members primarily through digital media instead of through the mail and/or email.

### III. Discussion

#### A. Appointing a Notice Administrator

Plaintiffs' request that A.B. Data be appointed as notice administrator is uncontested. Given its extensive experience administering notice in class actions—including antitrust class

actions against pharmaceutical companies—I appoint A.B. Data as notice administrator without hesitation.

### B. Plaintiffs' Proposed Manner of Notice

After a court certifies a Rule 23(b)(3) class,

> the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means.

Fed. R. Civ. P. 23(c)(2)(B). The final sentence of this Rule, which allows for notice to be effectuated through electronic and "other appropriate means," was added on December 1, 2018. In its notes to the 2018 amendment, the Advisory Committee emphasized that courts should consider technological innovation to determine what constitutes the best method of notice in a particular case. "Although first class mail may often be the preferred primary method of giving notice," the Committee wrote,

> courts and counsel have begun to employ new technology to make notice more effective. Because there is no reason to expect that technological change will cease, when selecting a method or methods of giving notice courts should consider the capacity and limits of current technology, including class members' likely access to such technology.

Advisory Committee Notes on 2018 Amendments to Fed. R. Civ. Proc. 23. The Committee also noted that "[c]ounsel should consider which method or methods of giving notice will be most effective; simply assuming that the 'traditional' methods are best may disregard contemporary communication realities." *Id.*

Having scrutinized EPPs' enhanced notice proposal as well as defendant's critiques of the proposal, I am satisfied that EPPs' plan is the "best notice that is practicable under the circumstances." *See* Fed. R. Civ. P. 23(c)(2)(B). First, and most importantly, the plan will reach a large percentage of the class. "The lynchpin in an objective determination of the adequacy of a

5

proposed notice effort is whether all the notice efforts together will reach a high percentage of the class." Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, at 3 (2010), www.fjc.gov/sites/default/files/2012/NotCheck.pdf. According to the Federal Judicial Center ("FJC"), a notice plan that reaches between 70 and 95 percent of the class is reasonable. *Id.* Plaintiffs' plan easily meets that target. Eric J. Miller, Senior Vice President of Case Management at A.B. Data, estimates that EPPs will reach 80 percent of the class's consumer members through their plan. The total number of TPPs in the country is unknown. As a result, A.B. Data cannot precisely estimate the percentage of TPPs that its plan will notify. Nevertheless, because the TPP Database includes the largest PBMs in the country (the top six of which represent more than 95 percent of the prescription claims in the United States) and the country's largest insurers (which represent well over 200 million people), A.B. Data is confident that its plan will reach significantly more than 80 percent of TPPs, easily satisfying the FJC's threshold.

Moreover, proposals similar to EPPs' current one—those that notify TPPs by mail and consumers primarily through an online media campaign—have been used in many other pharmaceutical antitrust class actions to notify both consumers and TPPs. *See In re Aggrenox Antitrust Litig.*, 14-md-2516 (D. Conn. Mar. 6, 2018), Dkt. Nos. 748-1 & 766; *In re Lidoderm Antitrust Litig.*, 14-md-2521 (N.D. Cal. Jun. 13, 2017), Dkt. Nos. 741-5 & 751; *In re Solodyn (Minocycline Hydrochloride Antitrust Litig.*, 14-md-2503 (D. Mass. Apr. 14, 2017), Dkt. Nos. 532, 533-8, & 555; *In re Nexium (Esomeprazole) Antitrust Litig.*, 12-md-2409 (D. Mass. Dec. 3, 2013), Dk. Nos. 466 & 573. Notably, these notice plans were approved even before Rule 23(c)(2)(B) was amended in 2018 to account for technological innovation.

Defendant argues that, because Rule 23(c)(2)(B) directs courts to provide "individual notice to all members who can be identified through reasonable effort," EPPs must send individual notice to consumer class members. Allergan's argument rests on the statements made in the declaration of Laura R. Craft, one of plaintiffs' experts for class certification. In support of class certification and to address Allergan's arguments regarding the presence of uninjured class members, EPPs argued that a straightforward process could be used to identify class members who made Restasis purchases and determine the amount they paid. For this proposition, they relied on Ms. Craft, who stated that it would be possible "to ascertain the identity of up to 97% to 99% of consumer class members" by subpoenaing "data from the seven largest PBMs [and] the fifteen largest pharmacy operators." Craft. Rep. ¶¶ 5, 20. Ms. Craft declared that this data would make "it possible to identify Class members, apply [class] exclusions, and assure that remaining members have in fact been injured." Craft Rep. ¶ 13.

But, as EPPs point out, Ms. Craft did not opine on the questions central to this motion: the ease with which the data could be used to collect consumers' addresses, how accurate the addresses would be, or the most effective method to contact consumers. In other words, Ms. Craft did not offer any opinion on whether identifying class members for notice purposes could be done through "reasonable effort." *See* Fed. R. Civ. P. 23(c)(2)(B). Mr. Miller, by contrast and critically, represents that—because mailed notices often are not read; mailing addresses may be outdated or incomplete; and email addresses are frequently inactive or unavailable in the subpoenaed data— the reach of EPPs' plan to notify consumers is "the same or better" than using the subpoena process to obtain addresses and send notice to individual class members. Miller Decl., ¶¶ 28−31.

Defendant offers nothing to dispute Mr. Miller's assertion. Nonetheless, it argues that, because consumer class members' addresses could be discovered through the extensive subpoena

7

process, that process must be employed. Yet Allergan also emphasizes that courts should conduct a cost-benefit analysis to determine whether individual class members can be identified through "reasonable effort." Allergan, Inc's Opposition to End-Payor Plaintiffs' Supplemental Memorandum in Support of Motion to Authorize Distribution of Class Certification Notice to the End-Payor Class at 10 (citing *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1099 (5th Cir. 1977); *Larson v. Sprint Nextel Corp.*, 2009 WL 1228443, at *3 (D.N.J. Apr. 30, 2009)). Here, where providing consumers with individual notice will offer no significant incremental benefit, the added financial and administrative burdens caused by using 22 subpoenas in an attempt to identify the addresses of consumer class members are not justified. This is especially true now, during a global pandemic that has caused many people to relocate, rendering the mailing addresses included in the subpoenaed data even less likely to be effective.

Further, I am unpersuaded by Allergan's argument that EPPs should be required to use both a digital media campaign and the mail to notify consumer class members. Where plaintiffs' digital plan will reach 80 percent of the class, requiring them to supplement the plan with individual notice is unnecessarily burdensome.

As for EPPs' plan to notify TPPs, I have no qualms about A.B. Data's use of the TPP Database. Courts have approved the use of the same database to provide notice to TPPs in other class actions. *See In re EpiPen (Epinephrine Injection USP) Marketing, Sales Practices and Antitrust Litigation*, 17-md-2785 (D. Kan. Oct. 13, 2020), Dkt. Nos. 2209 & 2240; *In re Loestrin 24 FE Antitrust Litig.*, 13-md-2472 (D.R.I. Sept. 27, 2019), Dkt. Nos. 1234 & 1245; *In re Aggrenox*, 14-md-2516, Dkt. Nos. 748−1 & 766; *In re Solodyn*, 14-md-2503, Dkt. Nos. 532, 533-8, & 555. Moreover, in cases where the database was used, A.B. Data has no knowledge of any TPP coming forward challenging class certification as a result of a failure to receive notice. And,

finally, Allergan has not pointed to any cases that suggest that the use of the TPP Database is problematic.

EPPs' plan to check the TPP Database against the IQVIA Xponent data set, which contains 40,000 TPPs, provides additional assurance of the sufficiency of the notice plan. While Allergan calls this data a "sample," the source it cites states that it contains 88 percent of outpatient prescriptions in 2016. *See* U.S. Dep't of Health & Human Services, Centers for Disease Control and Prevention, *Antibiotic Resistance Patient Safety Atlas: Outpatient Antibiotic Prescription Data*, at 1 (Apr. 22, 2019), https://gis.cdc.gov/grasp/PSA/Downloads/OAU-Data-Methods.pdf. Therefore the Xponent data can serve as a meaningful cross-check. I do not agree with defendant that it is necessary to subpoena data directly from PBMs and pharmacies to perform a cross-check.

### C. Defendant's Request for Discovery

In its opposition to EPPs' original notice plan, defendant sought an order requiring plaintiffs to produce certain information so that defendant could evaluate the adequacy of EPPs' notice plan. This request is denied.[2]

## IV. Conclusion

Because the proposed notice program satisfies the requirements of Rule 23(c)(2)(B) and constitutes the best notice practicable under the circumstances, I grant plaintiffs' motion with respect to the manner of notice. I also appoint A.B. Data as notice administrator.

**SO ORDERED.**

Dated:    March 15, 2021
         Brooklyn, New York

         /S/
         **NINA GERSHON**
         **United States District Judge**

---

[2] At the November 2020 hearing, I also rejected Allergan's argument in its original opposition brief that Rule 23 requires EPPs to set an end date for the proposed class.