**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RESTASIS (CYCLOSPORINE OPHTHALMIC EMULSION) ANTITRUST LITIGATION | 18-MD-2819 (NG) (LB) |
| THIS DOCUMENT APPLIES TO: <br><br> ALL END-PAYOR PLAINTIFF CLASS CASES | OPINION AND ORDER |

**GERSHON, United States District Judge:**

In this multi-district antitrust litigation against defendant Allergan, Inc., plaintiffs 1199SEIU National Benefit Fund; 1199SEIU Greater New York Benefit Fund; 1199SEIU National Benefit Fund for Home Care Workers; 1199SEIU Licensed Practical Nurses Welfare Fund; American Federation of State, County, and Municipal Employees District Council 37 Health and Security Plan; Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund; Ironworkers Local 383 Health Care Plan; Self-Insured Schools of California; Sergeants Benevolent Association Health & Welfare Fund; St. Paul Electrical Workers' Health Plan; and United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund (collectively, "End-Payor Plaintiffs" or "EPPs") have moved for final approval of the settlement, approval of the Plan of Allocation, and an order of dismissal with prejudice. Separately, they have moved for reimbursement of counsel's expenses and an award of attorneys' fees and service awards. Defendant has not opposed these motions, and no class member has objected.

For the reasons stated below, and to the extent indicated, plaintiffs' motions are granted.

**I.    Relevant Background**

    **A.    The Class Definition, Preliminary Approval Order, Class Notice, and Fairness Hearing**

On May 5, 2020, I certified the following End-Payor Class, which consisted of both consumers and third-party payors ("TPPs"):

> All persons or entities who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Restasis, other than for resale, who made their purchases in Arizona, Arkansas, California, Colorado, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine*, Massachusetts*, Michigan, Minnesota, Mississippi, Missouri*, Montana*, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont*, West Virginia, and Wisconsin from May 1, 2015, through the present (in the case of Arkansas only, July 31, 2017), for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries.[1]

The following people and entities were excluded from the End-Payor Class:

> Allergan, its officers, directors, employees, subsidiaries, and affiliates; all federal and state government entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; all persons or entities who purchased Restasis for purposes of resale or directly from Allergan or its affiliates; fully insured health plans, *i.e.*, plans that purchased insurance covering 100 percent of their reimbursement obligations to members; any "flat copay" consumers who purchased Restasis only via a fixed dollar copayment that does not vary on the basis of the drug's status as brand or generic; PBMs; and all judges assigned to this case and their chambers staff and any members of the judges' or chambers staff's immediate families.

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 40 (E.D.N.Y. 2020).

On September 23, 2021, EPPs, on behalf of themselves and the End-Payor Class, entered into a settlement with Allergan ("Settlement Agreement")[2] in which defendant agreed to pay the class $29,999,999.99.[3] On January 18, 2022, after my careful review of the Settlement Agreement, the Plan of Allocation, and the proposed notice forms, and after conducting two

---

[1] In the states marked with an asterisk, class members are only consumers, not TPPs.

[2] Terms capitalized in this Opinion and Order and not otherwise defined here have the same meanings as those used in the Settlement Agreement and its exhibits.

[3] Allergan has deposited this amount in an escrow account.

hearings with the parties at which I directed, among other things, numerous edits to the notice and claim forms, I granted preliminary approval of the settlement and the Plan of Allocation, approved the form and manner of notice to the class, appointed A.B. Data, Ltd. ("A.B. Data") as claims administrator, appointed an escrow agent, and set a date for a final Fairness Hearing (the "Preliminary Approval Order"). In the Preliminary Approval Order, for purposes of settlement, the class period set forth in the class definition was amended, with respect to all states except for Arkansas, to end on July 31, 2021.[4]

Notice of settlement was given by publication beginning on February 1, 2022; by direct mail and e-mail beginning on February 8, 2022; by toll-free telephone helpline beginning February 1, 2022; and by website, www.RestasisLitigation.com (the "Settlement Website"), beginning February 1, 2022.

On May 17, 2022, EPPs, by Class Counsel, filed a timely motion for reimbursement of their expenses as well as an award of attorneys' fees and service awards for the class representatives.

The deadline to e-mail or postmark requests to opt out from the End-Payor Class and Settlement Agreement was May 3, 2022, and the deadline for Class Members to object to the settlement, to oppose plaintiffs' motions, or to file notices of intent to appear at the Fairness Hearing was June 7, 2022. Based upon their requests, five End-Payor Class Members have been excluded from the class. No End-Payor Class Member has filed any objection, opposition, or notice of intent to appear.

On July 12, 2022, I held a virtual Fairness Hearing at which I heard from counsel.

---

[4] The amended class definition also excluded MSP Recovery Claims, Series LC, MSPA Claims 1, LLC, and MAO-MSO Recovery II, LLC, Series PMPI, which jointly filed a separate action against Allergan and have settled separately with it.

## II. Discussion

### A. Notice

#### 1. Errors on the Settlement Website

On February 3, 2022, my staff's review of the Settlement Website revealed three errors. First, although the TPP claim form posted on the website said that an exemplar spreadsheet and a list of National Drug Codes (which were needed to file a TPP claim) were included at the end of the claim form, these documents were not available on the website. Second, the TPP claim form said that the website contained an Excel spreadsheet that TPPs could download, but such a spreadsheet was not on the website. Finally, the Settlement Website contained only PDF versions of the claim forms, which class members needed to print and mail to submit a claim, even though the Long-Form Notice informed class members that they could submit a claim either by mail or online.

On February 3, 2022, my law clerk called Eric Fastiff, Esq., a lawyer for EPPs, to notify him of these issues. Mr. Fastiff responded that he would contact A.B. Data immediately. By the end of that day, the first two errors had been corrected. By February 4, 2022, consumer class members (as well as TPP class members) could submit claims online, correcting the third one.

My staff discovered another error several months later. The Long-Form Notice told class members that the Settlement Agreement could be accessed on the Settlement Website. But, on July 6, 2022, six days before the July 12, 2022 Fairness Hearing, my law clerk noticed that the Settlement Agreement was not posted on the website. That same day, I held an emergency virtual hearing with counsel for both parties to discuss this issue. Plaintiffs' counsel offered to provide, by July 7, 2022, a letter from A.B. Data containing its knowledge about why the Settlement

Agreement was not on the website. I scheduled another proceeding for July 8, 2022. Meanwhile, on July 6, 2022, the Settlement Agreement was placed on the Settlement Website.

On July 7, 2022, plaintiffs submitted a declaration from Eric J. Miller, Senior Vice President of A.B. Data's Class Action Administration Company. Mr. Miller revealed to the court, for the first time, that the Settlement Agreement had not been on the Settlement Website from its inception on February 1, 2022 until March 4, 2022. He wrote,

> On March 4, 2022, I reviewed the website and identified that the Settlement Agreement was not available to Class Members. I immediately directed our website development team to put the Settlement Agreement on the Court Documents page of the website. I previewed the revised Court Documents page to ensure the Settlement Agreement was added and authorized the website development team to make that version of the webpage the live version that users would see when they visited the website. Our web development team confirmed that the previewed version of the Court Documents page with the Settlement Agreement had in fact gone live.

Miller Decl., Dkt. No. 734, ¶ 5. At the July 8, 2022 proceeding, Mr. Miller stated that, when he made this correction, he had not shared the information with plaintiffs' counsel, explaining that he "saw it as kind of a no harm, no foul" since "[n]o one had asked for [the Settlement Agreement] in the past." 7/8/22 Tr. at 6.

Attached to Mr. Miller's declaration was documentation showing that the Settlement Agreement remained on the website through May 18, 2022. Mr. Miller could not identify why it was no longer there on July 6, 2022, but he speculated that it was accidentally removed on May 18, 2022, when he instructed his staff to post EPPs' counsel's filings related to their motions for final approval and attorneys' fees and expenses on the website.

Mr. Miller declared that he had reviewed the inbox containing emailed inquiries from class members and had confirmed that no one had "notified A.B. Data that the Settlement Agreement was not available or requested a copy of the Settlement Agreement." Miller Decl., ¶ 8. At the

July 8, 2022 proceeding, Mr. Miller also confirmed that A.B. Data had not received any letters requesting the Settlement Agreement from class members. He could not confirm that A.B. Data had not received any phone calls seeking the Settlement Agreement, but he inferred that was the case since, if a caller had told the company that the agreement was not on the Settlement Website, A.B. Data would have placed it there immediately.

### 2. Was the Notice Nonetheless Sufficient?

I must determine whether the imperfect effectuation of this one aspect of the notice plan that I previously approved, *see* Preliminary Approval Order, Dkt. No. 716, at 4−5; *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 527 F. Supp. 3d 269, 275 (E.D.N.Y. 2021), so infected the notice process that final approval of the settlement is unwarranted at this time. For the following reasons, I conclude that, despite A.B. Data's flawed management of the Settlement Website, class members nonetheless received due and adequate notice of the settlement.

To begin with, the Long-Form Notice was always accessible to class members on the Settlement Website. That notice form provided a detailed, plain-language description of the claims at issue and the terms of the settlement, and it set forth class members' options and how they could exercise them. It also notified class members of the Fairness Hearing and explained how Class Counsel would get paid. Critically, the Long-Form Notice told class members that they may contact A.B. Data to receive court documents, including the Settlement Agreement, or to ask any questions. Indeed, every page of the Long-Form Notice listed A.B. Data's toll-free number. In addition, the Plan of Allocation, which establishes exactly how the settlement funds will be divided among class members, was always on the Settlement Website.

There is no indication that the Settlement Agreement's absence from the website deterred class members from submitting claims. As of July 25, 2022 (more than two weeks before the

6

claims' filing deadline), A.B. Data had received over 28,000 consumer claim forms and 958 TPP claim forms. According to A.B. Data and Class Counsel, this claims rate is consistent with those they have observed in other end-payor pharmaceutical antitrust cases.

Finally, the Settlement Agreement was accessible on the Settlement Website from March 4, 2022 to May 18, 2022, and there is no basis to conclude that class members sought to access it during the periods when it was inaccessible. A.B. Data did not receive emails or letters asking for the agreement. And A.B. Data and plaintiffs' counsel reasonably infer that, because the Settlement Agreement was not posted on the website before A.B. Data or my staff noted its absence, no class member contacted A.B. Data looking for it (which would have prompted the company to place the agreement on the website). Moreover, no class member reached out to any of the lawyers in this action or my courtroom deputy—who were all listed on the Long-Form Notice as the recipients of objections to, and comments on, the settlement—seeking the Settlement Agreement.

I therefore conclude that class members received due and adequate notice of the settlement, the settlement's terms, these proceedings, and their rights to opt out of the class or to object to the settlement. I also conclude that class members had a full and fair opportunity to request exclusion or to object.

### B. Final Approval of the Settlement

Rule 23(e) permits approval of a class action settlement "only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). Traditionally, in determining whether a settlement is "fair, reasonable, and adequate," courts in the Second Circuit "review[ed] the negotiating process leading up to the settlement for procedural fairness, to ensure that the settlement resulted from an arm's-length, good faith negotiation between experienced and skilled

7

litigators." *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013). Courts also evaluated the substantive fairness of the settlement, considering the nine *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.*[5]

In 2018, Rule 23 was amended to list specific factors relating to the court's approval of a class settlement. Rule 23(e)(2) now provides that, in determining whether a settlement is "fair, reasonable, and adequate," courts must consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

---

[5] These factors are set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

Factors (A)–(B) are "procedural" factors that examine "the conduct of the litigation and of the negotiations leading up to the proposed settlement," while (C)–(D) are "substantive," addressing "the terms of the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. The goal of the amendment was "not to displace any factor [developed in any circuit], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision." *Id*. District courts in this Circuit, accordingly, have considered the *Grinnell* factors "in tandem" with the factors set forth in Rule 23(e)(2), *e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 311 (S.D.N.Y. 2020), and the Second Circuit has continued to endorse the use of the *Grinnell* factors following the 2018 amendment. *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762–63 (2d Cir. 2020).

### i. Procedural Fairness

The settlement is procedurally fair. The class representatives and class counsel have adequately represented the class. The parties agreed to settle after over three years of intense litigation in this complex antitrust action. Class counsel defeated, almost entirely, defendant's two motions to dismiss, obtained rulings in plaintiffs' favor in numerous discovery disputes, and won a complex class certification motion.

In addition, the settlement was achieved after a year and a half of arm's-length negotiations, including at three mediations sessions, the first before Magistrate Judge Lois Bloom of this court and the other two before retired Magistrate Judge Edward A. Infante, working as a private mediator.

### ii. Substantive Fairness

The settlement is also substantively fair. EPPs' highly skilled and experienced counsel were fully familiar with the strengths and weaknesses of their case when the settlement was

9

reached. Indeed, they settled after discovery was complete, and after the parties had fully briefed motions for summary judgment, as well as 11 *Daubert* motions to exclude expert testimony at trial. As Class Counsel acknowledge, these motions posed a risk that some or all their claims, or their experts' testimony, might not survive to trial. There was also a risk, again recognized by Class Counsel, that, if the case were tried, the jury might not conclude that Allergan's conduct caused Class Members any harm, as a generic version of Restasis did not enter the market until February 2022—over four years after Allergan's allegedly anticompetitive behavior had ceased. A $30 million settlement from Allergan under these circumstances is reasonable.

Moreover, the method of distributing relief to the class is effective. The terms and timing of the attorneys' fee and costs award, the amount of which is discussed in a later section, also weigh in favor of the settlement's substantive fairness. Additionally, the class has reacted positively to the settlement; no class member has objected, and only five have opted out of the class.[6]

The Plan of Allocation treats class members equitably relative to one another, as the funds will be distributed on a *pro rata* basis within three separate pools—one for consumers without insurance, one for insured consumers, and one for TPPs—and each claimant will receive at least $15.

Finally, the Settlement Agreement includes the following releases:

> u. "Released Claims" means any and all manner of claims, demands, rights, actions, suits, causes of action, lawsuits, proceedings, judgments, losses, liabilities, fees (including attorneys' fees and the fees of expert witnesses), costs, penalties, injuries, or damages of any kind whatsoever, whether class, individual, or otherwise in nature, whenever incurred, known or unknown (including, but not limited to,

---

[6] The only agreement identified under Rule 23(e)(3) established confidential terms to terminate the settlement in the event the number of class members excluded from the class reached a certain threshold. That threshold was not reached.

"Unknown Claims"), foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, contingent or non-contingent, accrued or unaccrued, in law or in equity, under the laws of any jurisdiction, which Releasors or any Releasor, whether directly, representatively, derivatively, or in any other capacity, ever had, now have, or hereafter can, shall, or may have, relating in any way to any conduct prior to the Effective Date and arising out of or related in any way in whole or in part to: (a) all claims asserted by End Payor Plaintiffs in this Action; and/or (b) all claims concerning alleged delay or impairment in the marketing, sale, manufacture, pricing, or purchase of, or the enforcement of intellectual property related to Restasis or its generic equivalents that could reasonably have been known and/or asserted in the Action, including but not limited to claims of *Walker Process* Fraud, sham Orange Book patent listings, sham citizen petitions, efforts to petition Congress, transactions with the Saint Regis Mohawk Tribe, or agreements between Allergan and potential manufacturers of generic Restasis resolving patent infringement litigation prior to the date hereof. The Released Claims shall include claims that would arise out of or relate to future purchases of Restasis® or generic Restasis® and that relate to the subject matters described above. For avoidance of doubt, "Released Claims" do not include claims excluded from release under ¶ 11 of this Agreement ("**Claims Excluded from Release**"). …

**7. Released Claims.** Upon the Effective Date, the Releasors (regardless of whether any such Releasor ever seeks or obtains any recovery by any means, including, without limitation, by submitting a Proof of Claim and Release, or by seeking any distribution from the Net Settlement Fund) shall be deemed to have, and by operation of the Judgment shall have fully, finally, and forever released, relinquished, and discharged all Released Claims against the Releasees.

**8. No Future Actions Following Release**. The Releasors shall not, after the Effective Date, seek (directly or indirectly) to commence, institute, maintain, or prosecute any suit, action, or complaint or collect from or proceed against Defendant or any other Releasee (including pursuant to the Action) based on any Released Claim in any forum worldwide, whether on his, her, or its own behalf, or as part of any putative, purported, or certified class of purchasers or consumers. This Settlement Agreement does not include any provisions for injunctive relief. Class Members shall look solely to the Settlement Fund for settlement and satisfaction against Defendant of all claims that are released hereunder.

**9. Covenant Not to Sue**. Releasors hereby covenant not to sue the Releasees with respect to any such Released Claims. Releasors shall

be permanently barred and enjoined from instituting, commencing, or prosecuting against the Releasees any Released Claims or claims related to the Released Claims. The Settling Parties contemplate and agree that this Agreement may be pleaded as a bar to a lawsuit, and an injunction may be obtained, preventing any action from being initiated or maintained in any case sought to be prosecuted on behalf of any Releasors with respect to the Released Claims.

**10. Waiver of California Civil Code § 1542 and Similar Laws**. The Releasors acknowledge that, by executing this Agreement, and for the consideration received hereunder, it is their intention to release, and they are releasing, all Released Claims, even Unknown Claims. In furtherance of this intention, the Releasors expressly waive and relinquish, to the fullest extent permitted by law, any rights or benefits conferred by the provisions of California Civil Code § 1542, as set forth in ¶ 1(aa), or equivalent, similar, or comparable laws or principles of law. The Releasors acknowledge that they have been advised by Class Counsel of the contents and effects of California Civil Code § 1542, and hereby expressly waive and release with respect to the Released Claims any and all provisions, rights, and benefits conferred by California Civil Code § 1542 or by any equivalent, similar, or comparable law or principle of law in any jurisdiction. The Releasors may hereafter discover facts other than or different from those which they know or believe to be true with respect to the subject matter of the Released Claims, but the Releasors hereby expressly waive and fully, finally, and forever settle and release any known or unknown, suspected or unsuspected, foreseen or unforeseen, asserted or unasserted, contingent or non-contingent, and accrued or unaccrued claim, loss, or damage with respect to the Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such additional or different facts. The release of unknown, unanticipated, unsuspected, unforeseen, and unaccrued losses or claims in this paragraph is not a mere recital.

**11. Claims Excluded from Release**. Notwithstanding the foregoing, the releases provided herein shall not release claims of Persons that are outside the Class; claims or damages arising solely from conduct by Defendant after the Effective Date of this Agreement; claims against Defendant or any Releasee pending in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No. 2:16-md-02724-CMR (E.D. Pa.); or claims against Defendant other than the Released Claims, such as for product liability, breach of contract, or personal injury; or claims to enforce the terms of this Agreement.

In sum, I find that the settlement is fair, reasonable, and adequate based on the factors set forth in Rule 23(e)(2) as well as in *Grinnell*, 495 F.2d at 463. It also complies with all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), and the Class Action Fairness Act (including 28 U.S.C. § 1715). I therefore grant EPPs' motion for final approval of the settlement.

Neither the contents of this Opinion and Order nor the Settlement Agreement nor any other Settlement-related document or related proceedings shall constitute, be construed as, or be deemed to be evidence of or an admission or concession by defendant as to the validity of any claim that has been or could have been asserted against defendant or as to any liability by defendant to the End-Payor Class.

### C. The Plan of Allocation and Claims Administration and Distribution

I approve the Plan of Allocation, which I discussed in detail with the parties before issuing the Preliminary Approval Order. I find that the plan is fair, reasonable, and adequate. I authorize Class Counsel and A.B. Data to administer and distribute the net proceeds of the settlement according to the terms of the Settlement Agreement, the Plan of Allocation, and this Opinion and Order.

However, based on its prior lapses in this litigation, described above, A.B. Data must be closely supervised in its administration and distribution of claims. It is not only that A.B. Data made mistakes that concerns me. Mistakes will happen in settlement administration, just as they do in any human enterprise. But, when they happen, mistakes must be detected and corrected promptly and effectively, and they must be reported. This is where A.B. Data fell short. Mr. Miller unilaterally determined that it was unnecessary to inform the court and plaintiffs' counsel that the Settlement Agreement was not on the Settlement Website from February 1, 2022 until

March 4, 2022.[7] When asked about this at the July 8, 2022 proceeding, Mr. Miller said that he did not think it was important to notify the court that the Settlement Agreement had not been available for a period of time because no class member had asked A.B. Data for the Settlement Agreement. This was not Mr. Miller's decision to make.

I am also troubled by Mr. Miller's acknowledgment that, in other class actions that he administered, the settlement agreement also had not been placed on the settlement website, and yet, he waited until the Settlement Website in this class action had been operative for more than four weeks before checking to see if his staff had posted the Settlement Agreement on it. It is likewise troubling that it was my staff, and not A.B. Data, that caught three significant errors on the Settlement Website two days after it went live. Mr. Miller or his staff should have carefully reviewed the website right after its launch.

In response to my concerns about A.B. Data, and with my input at the Fairness Hearing, plaintiffs' counsel have proposed the following plan to monitor A.B. Data's work in claims administration, which I adopt:

A.B. Data shall provide weekly updates to Class Counsel regarding the status of the claims administration process. Class Counsel shall provide bi-weekly updates to the Court regarding the status of claims administration. Class Counsel shall also designate at least one primary point of contact for claims administration issues within each of their respective firms. As of the date of this Opinion and Order, those attorneys are Scott Grzenczyk of Girard Sharp LLP, Robert S. Schachter of Zwerling, Schachter & Zwerling, LLP, Joseph R. Saveri of Joseph Saveri Law Firm, LLP, and David Rudolph of Lieff Cabraser Heimann & Bernstein, LLP.

---

[7] He also submitted to this court a declaration in May 2022 that implied that the Settlement Agreement had been available on the website since its inception. Miller Decl., Dkt. No. 725, ¶ 14.

Class Counsel shall continue to supervise A.B. Data throughout the claims administration process. Specifically, in addition to providing Class Counsel with weekly updates, A.B. Data shall confer with Class Counsel regarding the following steps in the claims administration process:

    a.    A.B. Data shall confer with Class Counsel regarding whether to close online claim filing or extend it for a period of time after the claims filing deadline.

    b.    A.B. Data shall confer with Class Counsel regarding the specific criteria for determining whether claims are deficient or ineligible.

    c.    A.B. Data shall confer with Class Counsel regarding the audit threshold and response requirements regarding deficiency and ineligibility issues.

    d.    A.B. Data shall escalate unresolved claims to Class Counsel for analysis and proposed resolution.

    e.    A.B. Data shall provide a draft declaration and final claims reports to Class Counsel for review and verification prior to filing.

Once the claims administration process has been completed, Class Counsel shall file a motion for distribution of settlement funds and for payment of A.B. Data's fees, discussed below (both additional accrued costs and any anticipated costs related to the distribution of settlement funds). Class Counsel anticipate filing this motion within four to six months from the date this Opinion and Order is entered.

**D.    Reimbursement of Expenses, Attorneys' Fees, and Service Awards**

EPPs' counsel seek reimbursement of their expenses totaling $4,635,684, plus the additional payment to A.B. Data. for work done to finalize the processing of claims and the distribution of settlement proceeds to Class Members. They also request an attorneys' fee award of $10,000,000, which is one-third of the settlement amount. Finally, counsel seek service awards

capped at $200,000 in total, to be divided equally among the named plaintiffs.[8]  Class members were provided notice of counsel's intention to seek these monetary awards and that the matters would be addressed at the Fairness Hearing.  No class member has objected.

I approve the requested attorneys' fee award.  EPPs' lawyers are extremely experienced in litigating pharmaceutical antitrust cases on behalf of end-payors.  During their court appearances before me and in their written submissions, they were thorough, diligent, and professional as they prosecuted this complex, discovery-intensive, and expert-dependent action.  In addition to opposing, with nearly complete success, two motions to dismiss, counsel litigated, intensively and successfully, a complicated class certification motion, which involved not only extensive briefing but a two-day evidentiary hearing.  Counsel also completed lengthy briefing on summary judgment motions and 11 *Daubert* motions—which I did not decide because of the settlement.

EPPs' counsel worked efficiently.  Until the Direct Purchaser Plaintiffs ("DPPs") reached a separate settlement with Allergan in February 2020 (which I approved in October 2020), counsel for the end-payors shared, whenever possible, the work on this case with counsel for the DPPs.  These plaintiffs' lawyers also reached numerous compromises with Allergan's counsel, saving time both for their clients and for the court.  In short, the fees counsel seek—which notably constitute less than 52% of their lodestar of $19,624,592.75—are well-justified and reasonable.

Counsel are also entitled to reimbursement of their expenses.  These expenses were incurred, in significant part, as a result of the expert-driven nature of this case.  Of the $4,635,684 in expenses that counsel seek to reimburse, almost $3.1 million was spent on experts for class certification and trial.

---

[8] Counsel initially requested that the $200,000 be divided among 10 named plaintiffs, but they revised their request after the court alerted them that there were 11 named plaintiffs.

Nearly $500,000 of counsel's expenses were paid to A.B. Data to provide notice to class members, operate the Settlement Website and a toll-free number to field inquiries from class members, and process claims. Because the deadline for class members to submit claims is August 11, 2022, A.B. Data's work is not complete. I therefore approve Class Counsel's request that they submit to the court, upon completion of claims processing, a request for the authorization of a final, additional payment to A.B. Data for work done to finalize the processing of claims and the distribution of settlement proceeds to class members. The total fees paid to A.B. Data shall be capped at $750,000.

I also award each of the 11 named plaintiffs a service award of $18,000. At the Fairness Hearing, plaintiffs' counsel persuasively described, and defense counsel corroborated, the substantial time and effort that participating in this litigation required of the relatively small staffs who work for the named plaintiffs. In addition, given that out-of-Circuit case law discussed in my class certification decision risked the denial of class certification, *see In re Restasis*, 335 F.R.D. at 13−14, 24−25, and given the possibility that plaintiffs would not be able to convince a jury that Allergan's actions delayed generic entry, these class members assumed the risk that the class ultimately would not recover. Their efforts should be compensated, and the private enforcement of the antitrust laws should be encouraged. Finally, while there is a potential risk that, "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard," *Weseley v. Spear, Leeds & Kellogg,* 711 F. Supp. 713, 720 (E.D.N.Y. 1989), I am satisfied that the work that the named class representatives did here, including the decision to settle the case, was for the benefit of the class as a whole.

Attorneys' fees, service awards, and reimbursement of litigation costs and expenses shall be paid upon the occurrence of the Effective Date.

## III. Conclusion

Plaintiffs' final approval motion is granted. Their motion for reimbursement of counsel's expenses and award of attorneys' fees and service awards is also granted to the extent that I approve the following payments for distribution from the settlement fund: (1) reimbursement of class counsel's expenses in the amount of $4,635,684; (2) an attorneys' fee award of $10,000,000; and (3) service awards of $18,000 to each of the named class representatives, for a total of $198,000. Class Counsel shall submit to the court, upon completion of claims processing, a request for the authorization of a final, additional payment to A.B. Data for work done to finalize the processing of claims and the distribution of settlement proceeds to class members. The total fees paid to A.B. Data shall be capped at $750,000. Except as provided for above, no costs or attorneys' fees are recoverable or sought under 15 U.S.C. § 15(a).

Attorneys' fees, service awards, and reimbursement of litigation costs and expenses shall be paid upon the occurrence of the Effective Date.

The settlement shall be consummated in accordance with its terms as set forth in the Settlement Agreement.

Class Counsel and A.B. Data are authorized to administer and distribute the net proceeds of the settlement according to the terms of the Settlement Agreement, the Plan of Allocation, and this Opinion and Order. Class Counsel shall file a motion for distribution of settlement funds and for payment of A.B. Data's fees once the claims administration process has been completed.

All the End-Payor Plaintiffs' and End-Payor Class Members' claims against Allergan in the Action are dismissed with prejudice and without costs, except as provided for in § F of the Settlement Agreement.

The Court retains exclusive jurisdiction over the implementation and enforcement of the Settlement Agreement.

Releasors' Released Claims with respect to Releasees are hereby released, such releases being effective as of the Effective Date.

Releasors are permanently enjoined and barred from instituting, commencing, or prosecuting any action or other proceeding asserting any Released Claims against the Releasees.

With respect to any non-released claim, no rulings, orders, or judgments in this Action shall have any res judicata, collateral estoppel, or offensive collateral estoppel effect.

There being no just reason for delay, the Court directs that this Opinion and Order and judgment be final and appealable. The Court finds that no order under Fed. R. Civ. P. 54(b) is necessary, but that, if such an order were necessary, the requirements of Rule 54(b) are satisfied.

The Clerk of Court is directed to enter judgment in accordance with this Opinion and Order.

                                         **SO ORDERED.**

                                         /S/
                                        **NINA GERSHON**
                                        **United States District Judge**

August 2, 2022
Brooklyn, New York